Filed 1/29/21  B.B. v. Superior Court CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| B.B.,<br><br>        Petitioner,<br><br>        v.<br><br>THE SUPERIOR COURT OF SAN DIEGO COUNTY,<br><br>        Respondent;<br><br>SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>        Real Party in Interest. | D078104<br><br><br>(Super. Ct. No. EJ4367) |

PROCEEDINGS for extraordinary relief after reference to a Welfare and Institutions Code section 366.26 hearing.  Gary M. Bubis, Judge. Petition denied.

Dependency Legal Services of San Diego; Law Office of Berta Zangari, Erin Stredwick and Marisa Mittelman for Petitioner.

No appearance by Respondent.

1

Thomas E. Montgomery, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Kristen M. Ojeil, Deputy County Counsel, for Real Party in Interest.

Petitioner B.B. (Mother) seeks extraordinary writ review, pursuant to rule 8.452 of the California Rules of Court, of the respondent juvenile court's order terminating her reunification services and setting a Welfare and Institutions Code section 366.26[1] hearing for her infant daughter, H.B., to be held on February 9, 2021. Mother contends that there is insufficient evidence to support the court's finding, by clear and convincing evidence, that she received reasonable reunification services before it set the matter for a section 366.26 hearing. Based on our reasoning *post*, we deny her petition.

FACTUAL AND PROCEDURAL BACKGROUND

Mother suffered multiple strokes as a teenager, leaving her visually impaired and with other physical disabilities, including limited mobility in her hands and an inability to walk independently.[2] Mother requires a personal caregiver and an additional adult to safely care for her son E. during visitation.[3]

In February 2019, H.B. was born. Concerned about Mother's ability to safely care for H.B., hospital staff contacted the San Diego County Health and Human Services Agency (Agency). Staff reported that Mother was

_____

[1]   All statutory references are to the Welfare and Institutions Code.

[2]   Mother stated she has an axonal brain injury and cortical blindness, but can see persons, objects, and colors.

[3]   A family court order gave E.'s father custody of him. Mother agreed to an open adoption of her first child, J.

2

unable to pick up H.B., hold her, position her to breastfeed, change her clothing or diaper, bathe her, or observe whether she was asleep or awake.

In March, concerned about the ability of Mother and her caregiver to safely care for H.B., the Agency filed a juvenile dependency petition for H.B. pursuant to section 300, subdivision (b)(1). Although the court initially detained H.B., it dismissed the petition the following month on the Agency's recommendation after Mother arranged for 24-hour caregivers to assist her with H.B.'s care.

In July, Mother was at a restaurant with H.B. and their respective caregivers when Mother lost hold of H.B. and H.B. fell and hit her head on a tile floor. When paramedics were called, Mother attempted to leave with H.B. before they arrived. Paramedics arrived and recommended that Mother take H.B. to an emergency room. The following day, Mother instead took H.B. to an urgent care center. Mother's caregivers reported that Mother resisted their suggestions regarding safely caring for H.B. and expressed concern about Mother's judgment and decisionmaking in caring for H.B.

In July, the Agency filed a new section 300, subdivision (b)(1) petition for H.B. and the court detained her out of Mother's home with a nonrelated extended family member (NREFM). In its jurisdiction and disposition report, the Agency stated it recommended that the court make a true finding on the petition, order that H.B. be placed out of the home, and order that Mother participate in reunification services and receive supervised visits with H.B. The Agency was particularly concerned with Mother's apparent resistance to the caregivers' instructions for, and assistance in, safely caring for H.B. At an August child and family team (CFT) meeting, Mother told the Agency that the only services she required to safely care for H.B. were her twice-weekly individual therapy and daily support from her caregivers. The Agency

3

instead recommended a case plan for Mother, consisting of: (1) a domestic violence program; (2) a psychological evaluation (to obtain clarification on her mental health and what interventions would help her reunify with H.B.); (3) general individual counseling with a TERM-approved therapist; and (4) a parenting program.[4] The Agency also referred Mother to a visitation coach, but the coach declined to help Mother because of the "high level of supervision" she required. The Agency reported that Mother's twice-weekly supervised visits and daily video calls with H.B. were consistent and appropriate.

In early October, Mother participated in a psychological evaluation conducted by Katherine Ellis, Ph.D. In late October, Dr. Ellis issued a written report regarding her evaluation of Mother. She diagnosed Mother with a paranoid personality disorder. She further found that Mother had cognitive impairment that caused her difficulty in manipulating and processing information in an abstract manner. Dr. Ellis stated that Mother was "unable to demonstrate insight into how these dysfunctions have attributed to her ability to care for herself and her minor children." Dr. Ellis believed that Mother's paranoid and persecutory symptoms were impeding her ability to comply with reunification goals and accept recommendations made by the Agency and her caregivers.

In response to the Agency's request for diagnostic clarification and treatment recommendations, Dr. Ellis stated that Mother would benefit from individual therapy utilizing a supportive approach in exploring and managing symptoms of paranoid personality disorder (i.e., cognitive

---

[4] TERM is an acronym for the Treatment and Evaluation Resources Management program adopted by the County of San Diego.

4

behavioral therapy, behavioral therapy, mindfulness-based stress reduction, skills-based group, etc.). She believed that individual therapy with a trusted provider should be a priority and that Mother should "be matched with a provider who can provide empathy and mutual respect to allow for [Mother] to develop autonomy and gain insight into her role in [H.B.'s] case. Treatment should focus on accountability and increasing coping and communication skills to support [Mother] in co-parenting with caregivers." Dr. Ellis opined that Mother "would benefit from individual therapy (i.e., interpersonal skills training, mindfulness, etc.); conjoint therapy (i.e., Dyadic Therapy); parent coaching (i.e., co-parenting, education, conflict resolution); and case management . . . ." Dr. Ellis also stated that a "neuropsychological evaluation would be beneficial in determining the extent of ABI [i.e., acquired brain injury] on executive functioning in order to guide treatment recommendations and goals. It is recommended results of [the] neuropsychological evaluation be incorporated into individual therapy treatment goals in order to build awareness and acceptance of any existing cognitive impairments and develop associated learning and coping strategies." Dr. Ellis believed that it was likely Mother would require a full 12 months of treatment due to her cognitive impairments and personality factors.

On November 4, 2019, the court held a contested jurisdiction and disposition hearing. The court found the petition's allegations to be true, declared H.B. a dependent of the court, removed her from Mother's custody, and placed her with NREFMs. The court further found that Mother had been actively involved in the development of the Agency's proposed case plan for her. The court approved and adopted the Agency's proposed case plan for Mother, except that it struck the domestic violence program requirement (per

5

Mother's request). The court denied Mother's request for a visitation coach. The court stated:

> "This case to me involves more of [M]other's willingness to accept direction with regard to the safety of her child. She is appearing at times to be defensive about it, and indicates that she doesn't need the help. I believe that a bit of an openness to accepting some of the disabilities, and some of the facts of dealing with those disabilities, in light of raising a young child is more of the issue, not necessarily teaching . . . someone how to diaper or hold a child. She has two full-time caregivers to help her with that."

The court advised Mother of her right to appeal its decision and then set a six-month review hearing for May 4, 2020.[5]

In its six-month review report, the Agency stated that on December 9, 2019, Mother began individual therapy with Dr. Judy Matthews in El Cajon. On January 17, 2020, Mother moved to National City, discontinued treatment with Dr. Matthews, and requested a new therapist closer to her new home. On January 23, Mother was given a referral for a new therapist, but a week later she stated she would rather resume treatment with Dr. Matthews until a closer therapist could be located. On or about February 14, Mother resumed treatment with Dr. Matthews. On March 17, Dr. Matthews reported to the Agency that all Mother does during sessions was yell and cry. Dr. Matthews did not believe Dr. Ellis's diagnosis of Mother with paranoid personality disorder was correct. Dr. Matthews stated Mother had a very concrete way of thinking (i.e., "completely black or white") and has difficulty with hypotheticals and abstract thinking. Mother had also expressed

---

[5]     The record does not show any appeal was filed by Mother challenging the November 4, 2019 order.

distrust of the Agency and believed she was being taken advantage of because of her disability.

On April 17, 2020, Dr. Matthews informed the Agency that she had not talked to Mother in over a month, that her contact number for Mother no longer worked, and that Mother had not reached out to her. Dr. Matthews stated that Mother had been making good progress, but she had a "meltdown" during their last session because of her grieving the loss of H.B.

The Agency noted that Mother had completed her case plan's requirement for a psychological evaluation prior to the November 4, 2019 disposition hearing. The Agency reported that Mother had completed an in-home parenting program. The Agency also reported that prior to the COVID-19 pandemic, Mother had attended two weekly in-person visits with H.B. and made regular video calls. During visits, Mother showed progress in listening to others' suggestions for care of H.B., although she continued to sometimes misinterpret suggestions as attacks or criticism. The Agency reported that Mother typically denies doing anything wrong that caused H.B.'s dependency and claims that the Agency took H.B. from her based on disability discrimination. Mother also had instructed her caregivers to not speak with the Agency. Because the Agency remained concerned regarding Mother's ability to safely care for H.B., it recommended that the court continue H.B.'s placement in out-of-home care and continue Mother's reunification services.

On May 4, the court continued the six-month review hearing due to its COVID-19 pandemic-based closure and reset the hearing for July 30. On July 30, the court set an October 14 date for a contested six-month review hearing.

On September 24, the Agency issued a 12-month review report, recommending that the court continue reunification services for Mother and

7

find that she had made adequate progress on her case plan. The Agency also reported that it had struggled to maintain contact with Mother due to her multiple changes of phone numbers and e-mail addresses. It reported that Dr. Matthews had discharged Mother due to her lack of attendance after May 1. Mother did not request assistance in reengaging in therapy until August and then the Agency referred her to a new TERM therapist in September. Despite disruptions due, in part, to the COVID-19 pandemic, Mother's visits with H.B. were consistent and appropriate overall.

On October 14 and 15, the court conducted a contested six-month review hearing. The court admitted in evidence the Agency's reports and other documents. It also heard the testimony of Agency social worker Lizeth Alvarez, Mother, Joy (Mother's then-current caregiver), and G.W. (Mother's friend). Alvarez testified that she was assigned H.B.'s case in June. The Agency's primary concern was the ability of Mother and her caregivers to safely care for H.B. As of June, the only remaining service of Mother's case plan was individual therapy. In July, she learned that Dr. Matthews had discharged Mother due to her lack of communication and attendance. Although Alvarez referred Mother to a new therapist on September 17, that therapist had not yet begun to provide therapy to Mother because of an inability to reach her. Alvarez testified that the Agency had not referred Mother for dyadic therapy, a skills-based interpersonal group, or a neuropsychological evaluation. She did not know whether there had been any conversations between the Agency and Dr. Matthews regarding whether Dr. Matthews had planned to address in therapy Mother's symptoms of paranoid personality disorder. The Agency relies on TERM to vet providers to ensure they meet certain qualifications. Alvarez testified that Mother had a parent partner who served as community support and her in-home

8

parenting program addressed parent-child interaction. The Agency recommended that Mother continue to receive reunification services with the hope that she would reengage in therapy and meet her treatment goals. However, Alvarez admitted that Mother had not made substantive progress with her case plan.

Mother testified that she had requested a visitation coach multiple times and asked for a new therapist when she felt she was not getting along with Dr. Matthews. She claimed to have texted Dr. Matthews twice in May, but received no response. She admitted changing her phone numbers multiple times, but claimed she had always immediately given her new numbers to the Agency. She believed she had made more progress over the past three years with her own therapist, Dr. Rozanne Miller, and that Dr. Matthews was not helping her make progress. Mother stated she had learned that she needed to listen to her caregivers and to know her limitations. She stated that she listens to her caregivers and discusses any issues with them. Her support persons include her neighbor, her neighbor's son, and her friend, G.W.

Joy testified that she had worked as a caregiver for Mother since February. She had never met H.B. and was unaware of the reason she was not in Mother's care. When E. visited Mother in her home, there were always two caregivers present and Mother did not interfere with her ability to care for E. and keep him safe. On cross-examination, Joy admitted that about once a week she disagreed with Mother's directions for her care of E., which disagreements were typically resolved within two minutes after Mother relied on her (Joy's) opinion or assistance. Joy had observed Mother's disagreements with other caregivers and she would typically step in to give Mother and the caregivers a "breather." Joy had yet to communicate with the

9

Agency and had refused to accept a direct call from it, believing any call should go through her staffing agency. Joy stated that she would not follow any directive from Mother that would jeopardize H.B.'s safety.[6]

On October 15, the court found, by clear and convincing evidence, that return of H.B. to Mother would create a substantial risk of detriment to H.B.'s physical and emotional well-being. The court further found that Mother had been provided reasonable reunification services. Although Mother had made "some progress" toward reunification with H.B., the court found that there was not a substantial probability that H.B. would be returned to Mother by the 18-month review hearing date. The court stated that Mother was "wholly dependent on other caregivers to parent" her children and that Mother needed to acknowledge her various disabilities and allow others to essentially care for them under her supervision. The court found, however, that Mother had a "huge reluctance" to do so. The court had "clear concerns" that H.B. would remain at risk if placed with Mother. Accordingly, the court terminated Mother's reunification services and set a section 366.26 hearing for selection of a permanent plan for H.B.

Mother timely filed a notice of intent to file a writ petition and thereafter filed her petition challenging the October 15, 2020 order. The Agency, as the real party in interest, then filed its response to her petition.

---

[6]    G.W. testified that he provided support for Mother, but had not spoken with anyone from the Agency.

DISCUSSION

*Substantial Evidence Supports the Court's Finding That Mother
Was Provided with Reasonable Reunification Services*

Mother contends that there is insufficient evidence to support the court's finding, by clear and convincing evidence, that she received reasonable reunification services before it set the matter for a section 366.26 hearing.

A

"Family preservation, with the attendant reunification plan and reunification services, is the first priority when child dependency proceedings are commenced. [Citation.] Reunification services implement 'the law's strong preference for maintaining the family relationships if at all possible.' " (*In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, 1787.) Therefore, whenever a child is removed from a parent's custody, the juvenile court generally must order the social welfare agency (e.g., the Agency) to provide reasonable reunification services to the parent. (§ 361.5, subd. (a); *Christopher D. v. Superior Court* (2012) 210 Cal.App.4th 60, 69 (*Christopher D.*); *In re Brittany S.* (1993) 17 Cal.App.4th 1399, 1406.) "The agency must make a good faith effort to develop and implement reasonable services responsive to the unique needs of each family. [Citation.] The effort must be made, in spite of difficulties in doing so or the prospects of success. [Citations.] The adequacy of the reunification plan and of the agency's efforts to provide suitable services is judged according to the circumstances of the particular case." (*Christopher D.*, at p. 69.) "[T]he record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to

11

assist the parents in areas where compliance proved difficult . . . ." (*In re Riva M.* (1991) 235 Cal.App.3d 403, 414.) A parent is not required to complain about the lack of reunification services as a prerequisite to an agency fulfilling its statutory obligations. (*Mark N. v. Superior Court* (1998) 60 Cal.App.4th 996, 1014 (*Mark N.*).) At each review hearing, the court must determine whether reasonable services were provided to the parents, which services were designed to aid the parent to overcome the problems that led to the child's initial removal and continued custody. (§ 366.21, subds. (e), (f); *In re J.P.* (2014) 229 Cal.App.4th 108, 121.) "In almost all cases it will be true that more services could have been provided more frequently and that the services provided were imperfect. The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.) The court shall not set a section 366.26 hearing unless there is clear and convincing evidence that reasonable services have been provided or offered to the parents. (§ 366.21, subd. (g)(4).)

In reviewing a challenge to a finding that reasonable reunification services were provided to a parent, "our sole task . . . is to determine whether the record discloses substantial evidence which supports the juvenile court's finding that reasonable services were provided or offered." (*Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 762.) In applying the substantial evidence standard of review, even where the standard of proof in the juvenile court is clear and convincing evidence, we "must determine if there is any substantial evidence—that is, evidence which is reasonable, credible and of solid value—to support the conclusion of the trier of fact." (*In re Jasmine C.* (1999) 70 Cal.App.4th 71, 75, citing *In re Angelia P.* (1981) 28 Cal.3d 908, 924.) We resolve all conflicts in the evidence, and reasonable inferences

12

therefrom, in favor of the prevailing party. (*In re Jasmine C.*, at p. 75.) We may not reweigh the evidence or credibility of witnesses. (*Ibid.*; *In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.) In cases such as this case, "when presented with a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing evidence, [we] must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989,1005 (*Conservatorship of O.B.*), fn. omitted.) In so doing, we must, as discussed *ante*, "view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Id.* at pp. 1011-1012.)

B

The Agency asserts that Mother waived her challenge to the reasonableness of some or all of the reunification services offered or provided to her by not appealing the juvenile court's November 4, 2019, disposition order adopting a case plan for the provision of reunification services to Mother. In that prior order, the court adopted a case plan for Mother, including a psychological evaluation, individual counseling, and a parenting program, and, in so doing, expressly denied her request for a visitation coach. Furthermore, as discussed *ante*, the psychological evaluation had been conducted by Dr. Ellis, her written report had been completed, and that report was available to the court and the parties' counsel, *before* the November 4, 2019 disposition hearing. Also, Mother was present at the November 4, 2019 disposition hearing and advised by the court of her right to

13

appeal its dispositional order.  Yet, Mother did not file an appeal challenging her case plan, as adopted by the court, or any other provisions of its disposition order.  We conclude, as the Agency asserts, that Mother, by not appealing the November 4, 2019 disposition order, has forfeited or waived any challenge to the case plan adopted by the court as part of its disposition order, and that such challenge is also barred by the doctrine of res judicata.  (*Steve J. v. Superior Court* (1995) 35 Cal.App.4th 798, 811 (*Steve J.*).)  *Steve J.* stated:  "A challenge to the most recent order entered in a dependency matter may not challenge prior orders for which the statutory time for filing an appeal has passed.  [Citation.]  Here, the [parent] never appealed from the dispositional order.  The order adopting the reunification plan has long since become final.  [Citation.]  Therefore, petitioner has waived the opportunity to complain that the plan ordered by the court was unreasonable."  (*Ibid*.)  Accordingly, "[i]f . . . the parent . . . does not challenge an order for services in a timely fashion, they may not raise the issue when reunification is terminated."  (*Ibid*.; see also *Melinda K. v. Superior Court* (2004) 116 Cal.App.4th 1147, 1156 (*Melinda K.*) ["it is impermissible to challenge an earlier finding by way of an appeal from a subsequent order"]; *In re Cicely L.* (1994) 28 Cal.App.4th 1697, 1705 [same].)  Likewise, "[a]n appellate court generally will not consider a challenge to a trial court's ruling if the aggrieved party could have, but did not, timely object in the trial court when its purported error could easily have been corrected.  [Citations.]"  (*In re M.S.* (2019) 41 Cal.App.5th 568, 588.)  Most importantly, the California Supreme Court stated:  "If an order is appealable . . . and no timely appeal is taken therefrom, the issues determined by the order are res judicata."  (*In re Matthew C.* (1993) 6 Cal.4th 386, 393.)

14

Here, because Mother did not object to the case plan proposed by the Agency, and adopted by the court, at the November 4, 2019 disposition hearing (except for her request for a visitation coach which request the court denied) and did not appeal the disposition order adopting that case plan, we conclude that she forfeited and waived any challenge to the provisions of that case plan. (*Steve J.*, *supra*, 35 Cal.App.4th at p. 811; *In re M.S.*, *supra*, 41 Cal.App.5th at p. 588.) Furthermore, the doctrine of res judicata precludes Mother from challenging those issues decided by the court at the November 4, 2019 disposition hearing, including its adoption of Mother's case plan. (*In re Matthew C.*, *supra*, 6 Cal.4th at p. 393.) Accordingly, to the extent Mother now complains that her case plan, as adopted by the court in its November 4, 2019 disposition order, did not provide for a visitation coach or other specific reunification services (e.g., neuropsychological evaluation, dyadic therapy, etc.), she is barred from challenging that order, including its adoption of her case plan.

C

Although Mother cannot now challenge the provisions of the case plan adopted by the court at the November 4, 2019 disposition hearing, she is not precluded from challenging, and apparently does challenge, the Agency's subsequent actions in implementing that order and providing her with reasonable services as required by her case plan. (Cf. *Mark N.*, *supra*, 60 Cal.App.4th at p. 1014 [parent is not required to complain about lack of reunification services ordered by court as prerequisite to agency fulfilling its statutory obligations]; *Melinda K.*, *supra*, 116 Cal.App.4th at p. 1158 [same].) Because the Agency had an obligation to provide Mother with reasonable services ordered by the court as part of her case plan adopted at the November 4, 2019 disposition hearing, the reasonableness of the services

provided by the Agency pursuant to that case plan from the November 4, 2019 disposition order through the contested six-month review hearing on October 14 and 15, 2020, may properly be challenged by Mother in her instant petition. As Mother notes, it is the Agency (and not the parent or the court) that is charged with providing reasonable reunification services. (*In re Taylor J.* (2014) 223 Cal.App.4th 1446, 1452.) When a juvenile court exercises its discretion and orders a reunification case plan for a parent, the Agency cannot disregard that order, but must instead provide the parent with reasonable reunification services to implement that plan. (*In re Calvin P.* (2009) 178 Cal.App.4th 958, 964.) Furthermore, we believe that if the Agency becomes aware of new events or information since the court's adoption of that case plan, which information would significantly affect the services required by that case plan or otherwise adversely affect the prospects of reunification, the Agency has a responsibility to modify and/or supplement the reunification services provided to a parent and, in certain circumstances, request that the court modify the parent's case plan. (Cf. *In re Taylor J.* (2014) 223 Cal.App.4th 1446, 1452 [during reunification period, agency did not provide reasonable reunification services because it failed to maintain contact with mother's service providers, inform her that program did not meet her case plan's requirements, and assist her in locating approved program]; *In re Riva M., supra*, 235 Cal.App.3d at p. 414 [agency must maintain reasonable contact with parents during course of case plan and make reasonable efforts to assist parents in complying with that plan]; *In re Elizabeth R., supra*, 35 Cal.App.4th at pp. 1777, 1792 [no showing that visitation or other services were adequate for mother hospitalized for all but five months of 18-month reunification period].)

Applying the above principles to Mother's contentions, we conclude she has not carried her burden to show the Agency failed to satisfy its obligation to provide her with reasonable reunification services. In particular, Mother asserts that the Agency should have followed the recommendations set forth in Dr. Ellis's report and arranged for a neuropsychological evaluation and dyadic and other therapeutic services or modalities for her. However, the court and the parties had Dr. Ellis's report before the November 4, 2019 disposition hearing. Therefore, if Mother believed that one or more of those specific services or modalities (which Dr. Ellis opined would be *beneficial* for Mother) should have been made part of her case plan, she should have raised that issue with the Agency prior to the disposition hearing and with the court at that hearing, and she should have filed an appeal of the court's November 4, 2019 disposition order. Because Mother did not do so, she cannot, as discussed *ante*, now challenge the omission of such services or therapeutic modalities from the case plan adopted by the court or the Agency's subsequent implementation of that plan. (*Steve J.*, *supra*, 35 Cal.App.4th at p. 811; *In re M.S.*, *supra*, 41 Cal.App.5th at p. 588; *In re Matthew C.*, *supra*, 6 Cal.4th at p. 393.) Alternatively stated, Mother cannot now assert that the case plan, in fact, required the Agency to provide those services or therapeutic modalities. The case plan adopted by the court at the November 4, 2019 disposition hearing did not require the Agency to provide those services or therapeutic modalities and Mother does not show otherwise.

Nevertheless, to the extent Mother argues that the Agency, in implementing her case plan, should have offered her services or modalities to help effectuate her case plan and further her reunification efforts, we conclude she has not carried her burden to show the Agency acted unreasonably by not so doing. Rather, there is substantial evidence in the

17

record to support the court's finding that the Agency offered and provided reasonable reunification services to Mother. The Agency is not required to provide a parent with all of the services that could possibly help the parent reunify with a child, nor do all of the services provided have to be perfect. As stated *ante*, "[i]n almost all cases it will be true that more services could have been provided more frequently and that the services provided were imperfect. The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.*, *supra*, 2 Cal.App.4th at p. 547.) Therefore, although Mother presumably may have benefited from a neuropsychological evaluation and/or dyadic and other therapeutic services or modalities, she does not show the Agency acted unreasonably in not providing them to her. As the Agency argues, Mother was provided with other services that may have effectively addressed the issues raised by Dr. Ellis. In particular, although Dr. Ellis believed that Mother could benefit from dyadic therapy, which she described as addressing aspects of parenting, developmental and emotional needs of infants, bonding, and attachment, the Agency could have reasonably believed that those therapeutic needs would be substantially addressed in Mother's in-home parenting program, which included a parent partner for her, as well as in her individual therapy with Dr. Matthews or another therapist, which were part of Mother's case plan and were provided by the Agency. As Alvarez testified, the in-home parenting program completed by Mother included a module that specifically addressed parent-child interaction.

Regarding a neuropsychological evaluation, Mother does not show that, despite its omission from her case plan, the Agency nevertheless acted unreasonably by not providing her with such an evaluation during her

18

reunification period. In addition to failing to request that a neuropsychological evaluation be made part of her case plan adopted by the court on November 4, 2019, neither Mother nor her counsel thereafter requested that the Agency or the court modify her case plan to add such a requirement or otherwise provide such an evaluation. If Mother and her counsel believed that a neuropsychological evaluation was essential, or even beneficial, to her efforts to reunify with H.B., we would have expected them have noticed such an evaluation had not been offered by the Agency, and raised that issue with the Agency and/or the court and requested that evaluation (by modification of her case plan or otherwise) at some point during the 11-month period between the November 4, 2019 disposition hearing at which her case plan was adopted and the October 2020 contested six-month review hearing. As we noted in *In re Christina L.* (1992) 3 Cal.App.4th 404, at page 416: "If Mother felt during the reunification period that the services offered her were inadequate, she had the assistance of counsel to seek guidance from the juvenile court in formulating a better plan . . . ." By failing to request a neuropsychological evaluation during that lengthy 11-month period, we conclude Mother forfeited her claim that the Agency did not provide her with reasonable reunification services by not offering her such an evaluation. (Cf. *ibid*.; *Sommer v. Martin* (1921) 55 Cal.App. 603, 610 [party cannot remain silent on infringement of legal rights, but has duty to look after legal rights and call court's attention to any infringement of them].) In any event, Mother merely speculates that such an evaluation would have led to additional, or more focused, therapeutic services or modalities addressing any cognitive deficits caused by her brain injury that would have had a material impact on her efforts to reunify with H.B.

19

Mother also argues that the Agency acted unreasonably in referring her to Dr. Matthews for individual therapy because Dr. Matthews may not have had sufficient expertise or training in treating patients with a paranoid personality disorder.  However, as the Agency argues, Mother's argument that Dr. Matthews lacked sufficient expertise or training to treat her issues is wholly speculative and unsupported by the record.  Dr. Ellis recommended that Mother would benefit from individual therapy to manage her symptoms of paranoid personality disorder, using approaches such as cognitive behavioral therapy, behavioral therapy, and mindfulness-based stress reduction.  Yet, Mother fails to show that Dr. Matthews (or, for that matter, any experienced psychologist with doctoral-level education and training) lacked the ability to offer those therapeutic counseling services or modalities and/or to competently treat a patient's paranoid personality disorder. Therefore, Mother has not carried her burden to show that the Agency's referral of Mother to Dr. Matthews for individual therapy was unreasonable.

Furthermore, to the extent Mother blames the Agency for her lack of progress in individual therapy, the record supports a finding that Mother was not sufficiently cooperative in participating in individual therapy with Dr. Matthews and/or promptly requesting a new therapist if she believed Dr. Matthews was not helping her in her reunification efforts.  The record shows that Mother missed about a month of therapy sessions with Dr. Matthews after she moved to a new home in January 2020.  After resuming therapy with Dr. Matthews in February 2020, Mother began missing sessions again soon thereafter, and on April 17, 2020, Dr. Matthews informed the Agency that she had not talked to Mother in over a month, that her contact number for Mother no longer worked, and that Mother had not reached out to her. Dr. Matthews ultimately discharged Mother as a patient due to her lack of

20

attendance after May 1. Although Mother claimed that she tried to contact the Agency to obtain a new referral for individual therapy, the court could reasonably find that claim not credible. Alvarez testified that she first she learned in July 2020 that Dr. Matthews had discharged Mother due to her lack of communication and attendance. In September, Alvarez referred Mother to a new therapist, who by the time of the October hearing had not yet begun to provide therapy to Mother because of an inability to reach her. The court could reasonably find that Mother's failure to consistently keep in contact, and attend therapy sessions, with Dr. Matthews and the new therapist to which she was referred, as well as Mother's failure to communicate her purported lack of progress in therapy with Dr. Matthews and promptly request that the Agency refer her to a new therapist, were the main reasons Mother did not progress in individual therapy. As the Agency notes, Mother had an obligation to communicate with the Agency and participate in the reunification process and the reunification services offered to her. (*In re Raymond R.* (1994) 26 Cal.App.4th 436, 441.) By failing to do so, the court could reasonably find that any deficiencies in the reunification process were primarily caused by Mother and not any failure by the Agency to offer or provide reasonable reunification services to her.

Based on our review of the record and construing the evidence and inferences therefrom favorably to the prevailing party, we conclude that there is substantial evidence to support the juvenile court's finding, by clear and convincing evidence, that the Agency, by offering and providing Mother with reunification services required by the case plan adopted by the court at the November 4, 2019 disposition hearing, such as a psychological evaluation, individual therapy, and a parenting program, provided Mother with reasonable reunification services. (*In re Jasmine C.*, *supra*, 70 Cal.App.4th at

p. 75; *In re Stephanie M.*, *supra*, 7 Cal.4th at pp. 318-319.) We further conclude that "the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by [the clear and convincing] standard of proof," which the court applied in making its finding.[7] (*Conservatorship of O.B.*, *supra*, 9 Cal.5th at p. 1005.) To the extent Mother cites evidence or inferences therefrom that could have supported a contrary finding by the juvenile court, she misconstrues and/or misapplies the substantial evidence standard of review.

---

[7] We note that although the circumstances of this case presumably made the court's decision particularly difficult given Mother's physical impairments and psychological problems, the court nevertheless properly viewed H.B.'s safety as the paramount issue throughout her dependency proceedings.

## DISPOSITION

The petition is denied.

IRION, J.

WE CONCUR:

BENKE, Acting P. J.

HALLER, J.